OPINION
{¶ 1} Appellant, Tonya Weiss ("Weiss") appeals her conviction in the Common Pleas Court of Union County of two counts of theft from an elderly person and one count of engaging in a pattern of corrupt activity.
 {¶ 2} In December of 2001, Luther Hilton ("Hilton"), an eighty-one year old man at the time, ran a personal advertisement in The Columbus Dispatch looking for companionship. Hilton's ad read as follows: "WM, seen 40 twice. I have a home, car, Harley Davidson and dogs. I need help grocery shopping, cooking, cleaning and keeping books. Any lady who wants TLC and a warm bed, please write! No drink or dope. Past unimportant, any age. Box 17, Buckeye Lake, OH 43008." Defendant's Exhibit B. Weiss, while incarcerated in the Ohio Reformatory for Women ("ORW") in Marysville, Ohio, responded to the advertisement. Weiss and Hilton corresponded by letter and telephone from approximately January 2002 through May 2002. Weiss used lies and deception in both her written letters and telephone conversations with Hilton to get him to send her money. Weiss lied about her marital status, her personal history and background, the reason she was incarcerated, the conditions at ORW and the reasons she needed money from Hilton. Hilton gave Weiss $750 for attorney fees, and approximately $560 in money orders and payments of bills for members of her family.
 {¶ 3} Similarly, Paul Shelton ("Shelton"), an eighty-four year old man, also ran a personal advertisement in The ColumbusDispatch in 2001 looking for companionship. Shelton's ad read as follows: "Senior WM seeking a respectable WF to live in a rural area." Weiss and Shelton corresponded by letter, telephone and in person from approximately March 2002 through August 2002. Weiss used lies and deception in her written letters, telephone conversations and in person conversations with Shelton to get him to give her money. The letters written by Weiss to Shelton were not available at trial as Weiss went to Shelton's house and burned all of the letters after her release from prison. Weiss also told Shelton lies about her marital status, her personal history and background, the reason she was incarcerated, the conditions at ORW and the reasons for and amounts of the money she claimed she needed from Shelton.
 {¶ 4} Weiss received from Shelton cash, clothing, a motor vehicle, and payments to her attorney, all totaling over $32,000. Weiss testified that she did errands for Shelton and took him to a doctor's appointment when she was released from ORW and that she considered herself to be Shelton's employee. Weiss testified that she and Shelton had made an arrangement that Weiss would be paid $375 a week for the work she did for Shelton. However, Weiss was never paid cash by Shelton for the services she provided, rather Weiss claims the clothing he bought for her granddaughter and the attorney fees Shelton paid constituted her compensation for the work she did for Shelton. After state authorities interceded on Shelton's behalf, Shelton was able to retrieve $10,000 of the money he paid for Weiss' attorney fees.
 {¶ 5} On July 22, 2002, Shelton contacted the Morrow County Sheriff's Office and reported that Weiss was stealing from him. However, Shelton discontinued his complaint after Weiss became hysterical upon learning that Shelton had reported her to law enforcement officers. After discontinuing his complaint, Shelton met with Weiss' attorney, Leo Hall, and signed an affidavit that stated Weiss never stole anything from him. However, Shelton testified at trial that he was deceived by Weiss regarding the amount of money that was needed by Weiss and for what purpose the money was being used by Weiss. Shelton also testified that he had expected a relationship from Weiss in exchange for the financial assistance he was providing for her.
 {¶ 6} Weiss was able to receive money from both Hilton and Shelton with the assistance of members of her family. Weiss' daughter, Tabatha Green ("Green"), was an active participant in Weiss' actions. Green was aware of Weiss' activities with regard to Hilton and Shelton and was aware of Weiss' prior history of theft from elderly persons. Green actively participated in concert with Weiss and enabled Weiss to receive funds from Hilton and Shelton. Green admitted at trial to receiving money from Jack Ortman ("Ortman"), a prior victim in which Weiss used deceit to receive money. Green also had a conversation with Weiss while she was incarcerated in ORW regarding Hilton and Shelton in which a reference was made to Ortman and Weiss' involvement with Hilton and Shelton was compared to her involvement with Ortman. The testimony at trial also revealed that Green had contact with both Hilton and Shelton and had received a financial benefit from both of the men. To a lesser extent, other members of Weiss' family, including her grandchildren, were involved in the interactions with Hilton and Shelton and received financial benefits.
 {¶ 7} Weiss was indicted on one count of theft from an elderly person, in violation of R.C. 2913.02(A)(2), a felony of the fourth degree pursuant to R.C. 2913.02(B)(3); one count of theft from an elderly person, in violation of R.C. 2913.02(A)(3), a felony of the second degree pursuant to R.C. 2913.02(B)(3); and one count of engaging in a pattern of corrupt activity, in violation of R.C. 2923.32(A)(1), a felony of the first degree. Following a four day trial in May of 2003, the jury returned verdicts of guilty on all three counts contained in the indictment. A sentencing hearing was held on May 30, 2003, in which the trial court sentenced Weiss to a term of incarceration at ORW for a period of seventeen months for Count I, eight years for Count II, and eight years for Count III, to be served concurrently.
 {¶ 8} It is from this conviction that Weiss now appeals, asserting the following two assignments of error.
Under the Due Process Clause of the Ohio and United StatesConstitutions, Ms. Weiss' convictions on counts I and II of theindictment, must be reversed because the state did not providesufficient evidence to sustain the jury's guilty verdict. Theverdict was also against the manifest weight of the evidence.
 The state failed to prove the existence of an "enterprise" asdefined in O.R.C. § 2923.31(C), sufficient to establish anongoing organization separate and distinct from the pattern ofcorrupt activity as required for a conviction under O.R.C. §2923.32.
 {¶ 9} In her first assignment of error, Weiss asserts that her convictions on counts I and II were not supported by sufficient evidence and were also against the manifest weight of the evidence. Count I of the indictment charged:
Tonya Weiss, on or about January 2002 through May, 2002 inUnion County, State of Ohio, with purpose to deprive LutherHilton, the owner of property or services, did knowingly obtainor exert control over either the property or services bydeception. The property being more than $500.00 but less than$5,000.00. The said Luther Hilton being eighty-one (81) years ofage, this constitute the offense of Theft From An Elderly Personin violation of Ohio Revised Code § 2913.02(A)(3), a felony ofthe fourth degree pursuant to RC § 2913.02(B)(3).
Count II of the indictment charged:
Tonya Weiss, on or about March 2002 through August 2002, inMorrow County, State of Ohio, in a continuing course of criminalconduct and with purpose to deprive Paul Shelton, the owner ofproperty or services, did knowingly obtain or exert control overeither the property or services by deception. The property beingmore than * * * $25,000.00. The said Paul Shelton beingeight-four (84) years of age, this constitutes the offense ofTheft From An Elderly Person in violation of Ohio Revised Code §2913.02(A)(3), a felony of the second degree pursuant to RC §2913.02(B)(3).
 {¶ 10} The criminal offense of theft is defined in R.C.2913.02 as follows:
(A) No person, with purpose to deprive the owner of propertyor services, shall knowingly obtain or exert control over eitherthe property or services in any of the following ways:
 (1) Without the consent of the owner or person authorized togive consent;
 (2) Beyond the scope of the express or implied consent of theowner or person authorized to give consent;
 (3) By deception;
 (4) By threat;
 (5) By intimidation.
 (B) * * *
 (3) Except as otherwise provided in division (B)(4), (5), or(6) of this section, if the victim of the offense is an elderlyperson or disabled adult, a violation of this section is theftfrom an elderly person or disabled adult, and division (B)(3) ofthis section applies. * * * If the value of property or servicesstolen is five hundred dollars or more and is less than fivethousand dollars, theft from an elderly person or disabled adultis a felony of the fourth degree. * * * If the value of theproperty or services stolen is twenty-five thousand dollars ormore and is less than one hundred thousand dollars, theft from anelderly person or disabled adult is a felony of the seconddegree. * * *
 {¶ 11} "`Elderly person' means a person who is sixty-five years of age or older." R.C. 2913.01(CC). Furthermore, deception is defined in R.C. 2913.01(A) as:
knowingly deceiving another or causing another to be deceivedby any false or misleading representation, by withholdinginformation, by preventing another from acquiring information, orby any other conduct, act, or omission that creates, confirms, orperpetuates a false impression in another, including a falseimpression as to law, value, state of mind, or other objective orsubjective fact.
 {¶ 12} Where an appellant challenges the legal sufficiency of the evidence, the relevant inquiry is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus,574 N.E.2d 492, following Jackson v. Virginia (1979), 443 U.S. 307,99 S.Ct. 2781, 61 L.Ed.2d 560. Therefore, the analysis for sufficiency of evidence focuses on adequacy. State v.Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541.
 {¶ 13} Count I of the indictment involved Weiss' theft by deception of Luke Hilton. The record provides sufficient evidence that Weiss knowingly deceived Hilton by making false and misleading representations. The State presented evidence in the form of written letters, taped telephone conversations and witness testimony that Weiss was deceiving Hilton in order to receive money from him. Weiss began deceiving Hilton by telling him she was not married, when in fact she was married to Jon Weiss the entire time she was corresponding with Hilton. Upon Hilton's inquiry as to who "Jon" was, Weiss told Hilton that Jon was her son-in-law. Hilton also inquired as to why Weiss had been referred to as "Mrs." and Weiss again lied to Hilton when she informed him that she was not married. Weiss deceived Hilton by lying as to the real reason she was incarcerated and failing to inform Hilton that she was incarcerated as a result of her conviction of theft in Ross County that involved an elderly man. Hilton testified that knowing the truth regarding either of these facts would have changed how he viewed the situation.
 {¶ 14} Weiss further deceived Hilton on a consistent basis with her deceptions regarding the money she sought from Hilton. Weiss told Hilton numerous lies that caused Hilton to send her money that he would not have otherwise sent. These lies included: Weiss stating that she needed a car upon her release from ORW and that she was not allowed to drive a car that was not titled in her name; Weiss telling Hilton that ORW policy did not allow her to have visitors that were not blood relatives; Weiss telling Hilton that she was not fed in ORW or the food was so terrible she could not eat it; Weiss telling Hilton that she needed money to go to a halfway house that she was never scheduled to go to; Weiss telling Hilton she could get out of ORW early if he could give her attorney money to work on her case; Weiss telling Hilton that her family members did not visit her or send her money; and Weiss informing Hilton that she had to have $500.00 "on account" at ORW in order to be released. Weiss also told Hilton that only relatives could send her money in ORW but that Hilton could send her money if he made it look like the money came from a relative. Weiss carefully instructed Hilton several times to place Tabatha Green's name and address as the sender of the money and not to include any notes or letters with the money orders.
 {¶ 15} Weiss also told Hilton lies in order to get him to pay bills for members of her family. Weiss asked Hilton to pay her granddaughter's water bill, otherwise her granddaughter would not have any water at her house. Weiss further convinced Hilton to help another granddaughter by paying for her car to be released from an impound lot. Weiss deceived Hilton into believing he and Weiss were forming a relationship by telling Hilton that she loved him in her telephone conversations with him and by telling him they would spend time together and she would take care of him upon her release from ORW.
 {¶ 16} After reviewing the evidence in the record in a light most favorable to the State, we conclude that there was sufficient evidence presented on each element of the offense of theft by deception in count I that any rational trier of fact could have found the elements proven beyond a reasonable doubt.
 {¶ 17} Count II of the indictment involved Weiss' theft by deception of Paul Shelton. The record provides sufficient evidence that Weiss knowingly deceived Shelton by making false and misleading representations. The State presented evidence in the form of taped telephone conversations and witness testimony that Weiss was deceiving Shelton in order to receive money from him. Weiss began deceiving Shelton by not telling him the real reason she was incarcerated and failing to inform Shelton that she was incarcerated as a result of her conviction of theft in Ross County that involved an elderly man. Weiss gave Shelton false information regarding her family. Weiss further misrepresented her relationship with her ex-husband by telling Shelton that her ex-husband was offering to pay for things if she would resume a relationship with him.
 {¶ 18} Weiss further deceived Shelton on a consistent basis regarding the money she sought from him. Weiss told Shelton numerous lies that caused him to send Weiss money that he would not have otherwise sent. These lies included: Weiss telling Shelton that she needed money for the halfway house that she was never scheduled to go to; Weiss asking Shelton for $4,700 for a car that only cost Weiss $2,000 and not telling Shelton about the difference in price; and Weiss telling Shelton she needed $6,500 for court costs that did not exist.
 {¶ 19} Weiss also told Shelton that only family members could visit at ORW and that money orders could only be sent by family members. Weiss then gave Shelton the same careful instructions she gave Hilton regarding placing Green's name and address as the sender of the money order. Weiss even told Shelton to place a nonexistent aunt's name, Christy Clausen, as the sender of the money orders. Weiss further told Shelton that only family members could pick her up at ORW upon her release, which was not true.
 {¶ 20} Weiss made Shelton believe she planned on spending time with him and that she would take care of him upon her release from ORW. However, for several months Weiss was corresponding with both Hilton and Shelton. Weiss was telling both men lies to make them believe she planned to be a companion of theirs upon her release from ORW. Hilton and Shelton were both sending Weiss money because of what they were being told by Weiss. Weiss told Shelton that she loved him during the same period of time she was telling Hilton she loved him. Weiss also told both men that she had not lied to them about anything.
 {¶ 21} After reviewing the evidence in the record in a light most favorable to the State, we conclude that there was sufficient evidence presented on each element of the offense of theft by deception in count II that any rational trier of fact could have found the elements proven beyond a reasonable doubt.
 {¶ 22} In order for an appellate court to reverse the trial court's judgment on the basis that the conviction is against the manifest weight of the evidence, the appellate court must unanimously disagree with the fact finder's resolution of any conflicting testimony. Thompkins, 78 Ohio St.3d at 389.
Weight of the evidence concerns `the inclination of thegreater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of the proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credibleevidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on itseffect in inducing belief.'
Id. at 387 (citations omitted). To reverse a conviction on the manifest weight of the evidence, "the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice * * *."State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
 {¶ 23} After reviewing the evidence outlined above, we cannot state as a matter of law that the jury clearly lost its way and created a manifest miscarriage of justice in finding Weiss guilty of the charges in counts I and II. The jury, being in a better position to weigh the evidence and determine the credibility of witnesses, reasonably concluded that Weiss was guilty of theft by deception beyond a reasonable doubt. The State produced evidence at trial in the form of letters written by Weiss, taped telephone conversations and witness testimony. In much of the State's evidence, Weiss incriminated herself by her very own spoken and written words. In addition, Weiss' credibility was attacked by testimony regarding her prior felony convictions, in which the facts in some of the prior convictions were quite similar to the facts in the instant case.
 {¶ 24} The circumstances in this case do not justify the granting of a new trial. Such discretionary power is reserved for the exceptional case in which the evidence weighs heavily against the conviction. Thompkins, 78 Ohio St.3d at 389. We therefore hold that the jury verdict is not against the manifest weight of the evidence and overrule Weiss' first assignment of error.
 {¶ 25} In her second assignment of error, Weiss asserts that the State failed to prove the existence of an "enterprise" as it applied to Weiss sufficient to establish an ongoing organization that was separate and distinct from the pattern of corrupt activity. Weiss contends that the State failed to present any evidence that Weiss has engaged in a pattern of corrupt activities with another person sufficient to establish an enterprise in this case.
 {¶ 26} As we set forth above, the relevant inquiry for sufficiency of evidence is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Jenks, 61 Ohio St.3d at paragraph two of the syllabus. We now review the essential elements for the offense of engaging in a pattern of corrupt activity.
 {¶ 27} R.C. 2923.32(A)(1) provides: "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity * * *." The elements of the offense are further defined in R.C. 2923.31, which provides:
(C) `Enterprise' includes any individual, sole proprietorship,partnership, limited partnership, corporation, trust, union,government agency, or other legal entity, or any organization,association, or group of persons associated in fact although nota legal entity. `Enterprise' includes illicit as well as licitenterprises.
* * *
(E) `Pattern of corrupt activity' means two or more incidentsof corrupt activity, whether or not there has been a priorconviction, that are related to the affairs of the sameenterprise, are not isolated, and are not so closely related toeach other and connected in time and place that they constitute asinge event.
* * *
For the purposes of the criminal penalties that may be imposedpursuant to section 2923.32 of the Revised Code, at least one ofthe incidents forming the pattern shall constitute a felony underthe laws of this state in existence at the time it wascommitted[.]
* * *
(1) `Corrupt activity' means engaging in, attempting to engagein, conspiring to engage in, or soliciting, coercing, orintimidating another person to engage in any of the following:
* * *
(2) Conduct constituting any of the following:
* * *
(c) Any violation of section * * * 2913.02 [theft] * * * ofthe Revised Code * * * when the proceeds of the violation, thepayments made in the violation, the amount of a claim for paymentor for any other benefit that is false or deceptive and that isinvolved in the violation, or the value of the contraband orproperty illegally possessed, sold, or purchased in the violationexceeds five hundred dollars[.]
 {¶ 28} Weiss proposes that since Ohio's statutory prohibition of engaging in a pattern of corrupt activity was modeled after the federal "RICO" statutes, 18 U.S.C. § 1961, et seq., this court should follow federal authority on this issue. Ohio courts have differentiated the federal and Ohio RICO statutes both in their definitions of an "enterprise" and what is required to prove a pattern of conduct. See State v. Schlosser (1997),79 Ohio St.3d 329, 681 N.E.2d 911. Federal courts have held that an enterprise "is not a `pattern of racketeering activity,' but must be `an entity separate and apart from the pattern of activity in which it engages.'" U.S. Demolition Contracting, Inc. v.O'Rourke Constr. Co. (1994), 94 Ohio App.3d 75, 85,640 N.E.2d 235, citing Old Time Enterprises, Inc. v. Internatl. CoffeeCorp. (C.A. 5, 1989), 862 F.2d 1213, 1217. The Ohio Supreme Court has stated that in order to prove the level of association necessary to support an R.C. 2923.32(A)(1) conviction, the State must "prove that each defendant was voluntarily connected to the pattern [of corrupt activity comprising the enterprise], and performed two or more acts in furtherance of it." State v.Siferd, 151 Ohio App.3d 103, 2002-Ohio-6801, 783 N.E.2d 591, at ¶ 43, citing Schlosser, 79 Ohio St.3d at 334 (emphasis added).
 {¶ 29} This court acknowledged in State v. Agner,135 Ohio App.3d 286, 291, 1999-Ohio-918, 733 N.E.2d 676 that although "the definition of enterprise includes an individual or sole proprietorship, we also find it equally significant that the crime of engaging in a pattern of corrupt activity requires thatthe offender be employed by or associated with such an entity." In Agner, we held that an entire enterprise could not consist of a lone drug dealer with nothing more and the defendant's conviction of engaging in a pattern of corrupt activity was overturned. Id. at 290. The evidence in the Agner case failed to show that the defendant was associated with any entity other than himself. Id. at 291.
 {¶ 30} However, the evidence in the case sub judice differs from that presented in the Agner case. The evidence presented at trial in this case, if believed by the jury, was sufficient to establish that Weiss was involved in an enterprise that included someone other than herself. First, the evidence presented at trial sufficiently established the elements of R.C. 2923.32
prohibiting engaging in a pattern of corrupt activity. As we determined above, the evidence supported Weiss' convictions of two counts of theft from an elderly person. There was also evidence presented of a prior theft conviction of Weiss in the Common Pleas Court of Ross County that served as a predicate offense to the charge of engaging in a pattern of corrupt activity.
 {¶ 31} Second, the State showed that the incidents of corrupt activity were related to the affairs of the same enterprise. "An enterprise may certainly be comprised of only two individuals, particularly given that the statute includes one individual within the scope of an enterprise." State v. Grimm (1995),102 Ohio App.3d 356, 358, 657 N.E.2d 318. The evidence presented at trial showed that Weiss and Green participated together in an enterprise that involved lies, deceit and misrepresentations in an effort to receive money from elderly men.
 {¶ 32} The record in this case established that Weiss called Hilton on May 16, 2002 and told Hilton to have her granddaughter, Robyn, come to his house the next day so Weiss could talk to her. When Weiss called Hilton on May 17, 2002, Hilton answered the phone and put Robyn on the line to talk with Weiss. Weiss communicated to Robyn to look for a house in the country for Weiss to have Hilton put in his name. Weiss told Robyn not to tell Hilton anything about her husband, Jon, or anyone else in the family. Weiss then persuaded Hilton to pay Robyn's water bill so the water would be turned back on at Robyn's house.
 {¶ 33} In addition, Green was in contact with Hilton and asked him for money on several occasions. Hilton told Weiss in a phone conversation on June 2, 2002 that Green asked him for cash that he was unable to give her. Weiss responded by telling Hilton that Green had been laid off and could not afford much right now. On July 11, 2002, Green told Weiss she called Hilton and drove to his house to receive $60 from him. During that conversation Weiss told Green she wasn't going to do again what caused her to be incarcerated in ORW. Green also told Weiss not to visit Hilton because he appeared to be a lot older than Ortman and he was "nasty and dirty." Green further told Weiss that she wouldn't be able to be around Hilton even for the money. Weiss made the reference to Green that Hilton is "on to this stuff." On July 13, 2002, Weiss and Green again made reference to Ortman when discussing Hilton. Weiss also made comments concerning the amount of money she thought she could get from Hilton as opposed to someone else. When Weiss told Green someone else had offered her thousands, Green told Weiss to "take it." Weiss also made a reference that the situation was the same as that which caused her to be incarcerated in ORW.
 {¶ 34} Robyn and Green also took a Chevy Beretta to Hilton's house for him to pay for repairs on the car. Hilton told Green that the repairs would be expensive. During a telephone conversation on July 16, 2002, Weiss told Green that she didn't want anything to do with Hilton anymore and that she was going to tell him she had to go to a halfway house upon her release from ORW. Weiss told Green not to tell Hilton anything other than Weiss would be going to a halfway house.
 {¶ 35} Green was also involved in Weiss' misrepresentations to Shelton. On July 14, 2002, Shelton told Weiss he had sent a money order for her to Green's house. During telephone conversations, Weiss told Green that money orders would be arriving at her house. On July 16, 2002, Weiss asked Green if an envelope had arrived at Green's house and Green responded that the envelope arrived and she had opened it. Weiss then told Shelton she never received the money order and it had been stolen. The evidence presented at trial showed that the money order sent by Shelton to Green's house had been deposited in Green's account.
 {¶ 36} Third, the evidence presented at trial also indicated that the incidents of corrupt activity were not isolated. Weiss' pattern of activity was shown to exist from January, 2002 until May, 2002 with respect to Hilton, and from March, 2002 through August, 2002 with respect to Shelton. Furthermore, the State provided evidence that Weiss was involved in this pattern of activity since approximately the year of 1999 with respect to Ortman.
 {¶ 37} Finally, the incidents in this case were not so closely related to each other and connected in time and place that they constituted a single event. Weiss' actions took place in Ross County with respect to Ortman, in Union County with respect to her correspondence from ORW, in Morrow County with respect to Shelton, and in Licking County with respect to Hilton.
 {¶ 38} After reviewing the evidence in the record in a light most favorable to the State, we conclude that there was sufficient evidence presented on each element of the offense of engaging in a pattern of corrupt activity in count III that any rational trier of fact could have found the elements proven beyond a reasonable doubt. We therefore overrule Weiss' second assignment of error.
 {¶ 39} Having found no merit with Weiss' assignments of error, the judgment of the Common Pleas Court of Union County is affirmed.
Judgment affirmed.
Shaw, P.J., and Cupp, J., concur.